1  William C. Wilson, SBN: 149683
   bwilson@wilsongetty.com
2  Kim S. Cruz, SBN: 177406
   kcruz@wilsongety.com
3  Ryan G. Canavan, SBN: 313990
   rcanavan@wilsongetty.com
4  WILSON GETTY LLP
5  12555 High Bluff Drive, Suite 270
   San Diego, California 92130
6  Telephone:   858.847.3237
   Facsimile:    858.847.3365
7  Attorneys for Defendant SPRUCE HOLDINGS, LLC dba REDWOOD SPRINGS HEALTHCARE
8  CENTER

9

10                    **UNITED STATES DISTRICT COURT**

11              **FOR THE EASTERN DISTRICT OF CALIFORNIA**

12  | GARY GAGLIOLO, individually and as Successor-In-Interest to the ESTATE OF JOSEPH GAGLIOLO, | Case No. |
    |---|---|

13  Plaintiffs, | [Removal from Superior Court of California, County of Tulare Case No. VCU284261] |

14  vs.

15  | | **DEFENDANTS, SPRUCE HOLDINGS, LLC dba REDWOOD SPRINGS HEALTHCARE CENTER'S NOTICE OF REMOVAL OF ACTION UNDER 28 U.S.C. §§ 1331, 1441, 1442(a)(1) and 1446** |

16  KAWEAH MANOR INC., d/b/a KAWEAH MANOR CONVALESCENT HOSPITAL; SPRUCE HOLDINGS LLC, d/b/a REDWOOD
17  SPRINGS HEALTHCARE CENTER; AND DOES 1-50,

18  | | *[Filed concurrently with Request for Judicial Notice and Exhibits thereto; and Civil Case Cover Sheet]* |

19  Defendants.

20

21       **TO THE CLERK OF THE UNITED STATES DISTRICT COURT FOR THE EASTERN**

22  **DISTRICT OF CALIFORNIA:**

23       PLEASE TAKE NOTICE AND NOTICE IS HEREBY GIVEN THAT Defendant, SPRUCE

24  HOLDINGS, LLC dba REDWOOD SPRINGS HEALTHCARE CENTER ("Redwood Springs")

25  hereby removes this action from the Superior Court of the State of California, County of Tulare to the

26  United States District Court for the Eastern District of California.  Removal is based on federal officer

27  jurisdiction and federal question jurisdiction pursuant to 28 U.S.C. §§ 1331, 1441, 1442 (a)(1), and

28  ///

---

**DEFENDANTS, SPRUCE HOLDINGS, LLC dba REDWOOD SPRINGS HEALTHCARE CENTER'S NOTICE OF REMOVAL OF ACTION**

1446. Defendant, Redwood Springs reserves all defenses and objections to venue based on 42 U.S.C.
§247d-6d(e)(1).

In support of this Notice of Removal, Defendant, Redwood Springs states as follows:

## I.  PLEADINGS

1.  On or about September 11, 2020, Plaintiff commenced this action in the Superior Court of the State of California for the County of Tulare entitled *Gary Gagliolo, Individually and as Successor-In-Interest to the Estate of Joseph Gagliolo v. Kaweah Manor, Inc., dba Kaweah Manor Convalescent Hospital; Spruce Holdings, LLC dba Redwood Springs Heatlthcare Center; and Does 1-50.,* Case No. VCU284261.  Pursuant to 28 U.S.C. §1446(a), true and correct copies of all process, pleadings and orders served on Redwood Springs in the Superior Court action are attached to Defendant's Request for Judicial Notice (hereinafter "RFJN") as Exhibit A.

2.  Plaintiff, Gary Gagliolo, Individually and as Successor-In-Interest to the Estate of Joseph Gagliolo, alleges that 91 year old, Joseph Gagliolo was a resident at skilled nursing facility, Redwood Springs Healthcare Center during the time relevant to the Complaint.  (See RFJN Exhibit A-Complaint, pgs. 5-7, ¶s 15-24, and pgs. 7-9, ¶s 28-35.)   Plaintiff further alleges Joseph Gagliolo was admitted to Kaweah Manor, Inc. dba Kaweah Manor Convalescent Hospital ("Kaweah") from 2016, through October 11, 2019, and at all times relevant to allegations against Kaweah as alleged in the Complaint.  (See RFJN Exhibit A- Complaint, pgs. 5, ¶14 and pgs. 6-7,  ¶s 19-27.)

3.  Plaintiff alleges that due to the wrongful acts and omissions of Defendant, Redwood Springs, decedent, Joseph Gagliolo became infected with COVID-19 during his residency at Redwood Springs and died due to the virus on April 27, 2020. (See Exhibit A- Complaint, pgs. 5-6, ¶s 15-18, pg. 6, ¶ 22, pgs. 7-9, ¶s 28-35 pg. 14, ¶ 60- pg. 15, ¶ 62, and pg. 15, ¶ 66) Plaintiff alleges causes of action for Negligence, Willful Misconduct, Violations of the Elder and Dependent Adult Civil Protection Act (California Welfare & Institutions Code §§15600 et. seq.); and Wrongful Death against all Defendants. (See RFJN Exhibit A- Complaint.)

## II.  THE PROCEDURAL REQUIREMENTS FOR REMOVAL HAVE BEEN MET

4.  Defendant, Redwood Springs was served with the Complaint on November 6, 2020, Defendant, Kaweah was served on November 11, 2020.

5.     Defendant, Redwood Springs' Notice of Removal was filed by December 7, 2020, and is timely under 28 U.S.C. §1446(b) as and this Notice has been filed within thirty (30) days of the service of a copy of the initial pleading setting forth the claims for relief.  Defendant, Redwood Springs files this Notice with the explicit consent of Defendant, Kaweah.  Kaweah's Notice of Joinder in Removal is filed concurrently with this Notice.

6.     Removal to the United States District Court for the Eastern District of California, is proper because the Complaint was filed in the Superior Court of the State of California for the County of Tulare, which is located within the jurisdiction of this District.  See 28 U.S.C. § 1441(a); and 28 U.S.C. § 84(c)(2).

7.     Pursuant to 28 U.S.C. §1446(d), a copy of this Notice of Removal is being served on Plaintiff, and Defendant, Kaweah, and a copy is being filed with the Clerk of the Court for the Superior Court of the State of California for the County of Tulare.

## III.     JURISDICTION EXITS UNDER 28 U.S.C. §1331 BASED ON THE PREP ACT

8.     This case is removable under 28 U.S.C. § 1441(a) on the basis of "original jurisdiction" because Plaintiff's Complaint asserts a claim "arising under" federal law within the meaning of § 1331.

9.     Plaintiff's Complaint alleges that due to the wrongful acts and omissions of Defendants, decedent, Joseph Gagliolo became infected with COVID-19 during his residency at Redwood Springs and died due to the virus on April 16, 2020. (See, RFJN Exhibit A- Plaintiff's Complaint, pgs. 5-6, ¶s 15-18, pg. 6, ¶ 22, pgs. 7-9, ¶s 28-35 pg. 14, ¶ 60- pg. 15, ¶ 62, and pg. 15, ¶ 66.)

10.     Such allegations relate to Defendant's administration or use of qualified pandemic products used to diagnose, mitigate, prevent, treat or cure COVID-19, or to limit the harm COVID-19 might otherwise cause including NIOSH approved respiratory protective devices (facemasks) and COVID-19 testing kits. Therefore, he claims fall under the Public Readiness and Emergency Preparedness Act, 42 U.S.C. §§ 247d-6d and 247d-6e (2006) (the "PREP Act"), the applicability of which presents a significant Federal Question relating to the ongoing national emergency and COVID-19 pandemic.

11.     The PREP Act, along with the Declarations of United States Health and Human Services Secretary Alex M. Azar, are federal statutes that apply to healthcare providers and skilled nursing

**DEFENDANTS, SPRUCE HOLDINGS, LLC dba REDWOOD SPRINGS HEALTHCARE CENTER'S NOTICE OF REMOVAL OF ACTION**

1  facilities, such as Defendant, with respect to the administration of countermeasures to diagnose, treat,

2  prevent and mitigate the spread of COVID-19.

3        12.    As Plaintiff has alleged a claim which is preempted under a federal statute, this Court

4  has original jurisdiction pursuant to 28 U.S.C. §1331, which provides that "[t]he district courts shall

5  have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the

6  United States."  Federal courts have "jurisdiction to hear, originally or by removal from a state court,

7  only those cases in which a well-pleaded complaint establishes either that federal law creates the cause

8  of action *or* that the plaintiff's right to relief necessarily depends on resolution of a substantial question

9  of federal law."  *Franchise Tax Bd. of State of Calif. v. Construction Laborers Vacation Trust for*

10 *Southern Calif.*, 463 US 1, 27-28 (1983); *Dennis v. Hart*  724 F.3d 1249, 1253 (9th Cir. 2013) *Rivet v.*

11 *Regions Bank of Lousiana*, 522 US 470, 475 (1998).

12       13.    "[A] state claim may be removed to federal court in only two circumstances—when

13 Congress expressly so provides . . . or when a federal statute wholly displaces the state-law cause of

14 action through complete pre-emption.  When the federal statute completely pre-empts the state-law

15 cause of action, a claim which comes within the scope of the scope of that cause of action, even if

16 pleaded in terms of state law, is in reality based on federal law.  In the two categories of cases where

17 [the United States Supreme] Court has found complete pre-emption, the federal statutes at issue

18 provided the exclusive cause of action for the claim asserted and also set forth procedures and remedies

19 governing that cause of action."  *Beneficial National Bank v. Anderson*, 539 U.S. 1, 8 (2003).

20       14.    While a plaintiff is ordinarily entitled to choose a state or federal forum and may evade

21 federal jurisdiction by pleading only state law claims, express or complete preemption is an exception

22 to the well-pleaded complaint rule.  Complete preemption exists when the preemptive force of federal

23 law is so powerful that it displaces any state law cause of action, and leaves room only for a federal

24 claim for purposes of the "well-pleaded complaint" rule. *Metropolitan Life Ins. Co. v. Taylor* (1987)

25 481 US 58, 63-64.  See also, NASDAQ OMX Group, Inc. v. UBS Securities, LLC, 770 F.3d 1010 (2d

26 ///

27 ///

28 ///

**DEFENDANTS, SPRUCE HOLDINGS, LLC dba REDWOOD SPRINGS HEALTHCARE CENTER'S NOTICE OF REMOVAL OF ACTION**

Cir. 2014).[1]   Complete preemption exists when (1) the statute relied upon by defendant as preemptive contains civil enforcement provisions within the scope of which plaintiff's state law claims fall; and (2) there is a "clear indication of Congressional intention to permit removal despite the plaintiff's exclusive reliance on state law." *Railway Labor Executives Ass'n v. Pittsburgh & Lake Erie R.R. Co*. 858 F2d 936, 942 (3rd Cir. 1988) citing *Franchise Tax Bd. of State of Calif. v. Construction Laborers Vacation Trust for Southern Calif., supra,* 463 U.S. 1, 24.

### A.     The PREP Act Generally

15.     The PREP Act provides liability protections for pandemic and epidemic products.  The legislation empowers the Secretary of Health and Human Services to issue a declaration providing immunity for "covered persons" to suits and liability under federal and state law with respect to claims relating to the administration of a "covered countermeasure" during a health emergency.  42 U.S.C. §§ 247d-6d(a)(1).   Specifically, 42 U.S.C. 247d-6d(a)(1) provides as follows: "Subject to the other provisions of this section, a covered person shall be immune from suit and liability under Federal and State law with respect to all claims for loss caused by, arising out of, relating to, or resulting from the administration to or the use by an individual of a covered countermeasure if a declaration under subsection (b) has been issued with respect to such countermeasure."

16.     On March 10, 2020, United States Health and Human Services Secretary Alex M. Azar issued a Declaration invoking the PREP Act for the COVID-19 pandemic.  The Declaration was effective as of February 4, 2020. (See Defendants' RFJN Exhibit B.)   In his Declaration, Secretary Azar subsequently issued an Amended Declaration under the PREP Act, which was effective as of March 27, 2020.  (See Defendants' RFJN Exhibit C.) The Amendment added respiratory protective devices approved by NIOSH (National Institute for Occupational Safety and Health) as a covered countermeasure under the PREP Act.  On June 4, 2020, Secretary Azar further amended the March 10, 2020 Declaration to clarify that covered countermeasures under the Declaration include qualified products that limit the harm COVID-19 might otherwise cause. This Amendment was effective as of

---

[1]  Federal jurisdiction requires that only one claim be identified as a federal question.  See 28 USC § 1367 [supplemental jurisdiction]; See also *Franchise Tax Board v.. Laborers Vacation Trust*, 463 US 1, 13 (1983).

**DEFENDANTS, SPRUCE HOLDINGS, LLC dba REDWOOD SPRINGS HEALTHCARE CENTER'S NOTICE OF REMOVAL OF ACTION**

1   February 4, 2020.  (See Defendants' RFJN Exhibit D.)

2      17.    On December 3, 2020, HHS Secretary Azar issued a Fourth Amended Declaration under

3   the PREP Act, and made this Amended Declaration effective as of February 4, 2020. (See Defendant's

4   RFJN Exhibit E- December 3, 2020 Fourth Amended Declaration of Health and Human Services

5   Secretary Azar Under the Public Readiness and Emergency Preparedness Act for Medical

6   Countermeasures Against COVID-19.)

7      18.    The Secretary's Fourth Amended Declaration provides that "***COVID-19 is an***

8   ***unprecedented global challenge that requires a whole-of-nation response that utilizes federal-, state-,***

9   ***and local-distribution channels as well as private-distribution channels.  Given the broad scale of***

10  ***this pandemic, the Secretary amends [Section VII of] the Declaration to extend PREP Act coverage***

11  ***to additional private-distribution channels*** . . . ." [Emphasis added.] (See Page 12 of Defendants'

12  RFJN- Exhibit "E".)

13     19.    The Fourth Amended Declaration specifically provides that Section VII of the

14  Declaration is amended to extend liability protection under the PREP Act to Covered Persons for

15  Recommended Activities that are related to: "Covered Countermeasures that are:

16          i. Licensed, approved, cleared or authorized by the FDA (or that are permitted to be used
            under an Investigational New Drug Application or an Investigational Device
17          Exemption) under the FD&C Act or PHS Act to treat, diagnose, cure, prevent, mitigate,
            or limit the harm from COVID-19, or the transmission of SARS-CoV-2 or a virus
18          mutating therefrom; or
            ii. A respiratory protective device approved by NIOSH under 42 CFR part 84, or any
19          successor regulations, that the Secretary determines to be priority for use during a public
            health emergency declared under section 319 of the PHS Act to prevent, mitigate, or
20          limit the harm from COVID-19, or the transmission of SARS-CoV-2 or a virus mutating
            therefrom."  (See Pages 22-23 of Defendants' RFJN- Exhibit "BB".)

21     20.    Secretary Azar's Fourth Amended Declaration further makes explicit that there can be

22  situations where not administering a Covered Countermeasure to a particular individual can qualify as a

23  decision relating to the administration of a countermeasure to an individual under the PREP Act.

24  ***"Prioritization or purposeful allocation of a Covered Countermeasure, particularly if done in***

25  ***accordance with a public health authority's directive, can fall within the PREP Act and this***

26  ***Declaration's liability protections.***" [Emphasis added.] (See pages 13 and 24 to 25 to Defendants'

27  RFJN- Exhibit "E" re Amendment to Section IX of the Secretary's Declaration.)

28

-6-

21.  Secretary Azar's Fourth Amended Declaration further provides that "***the Declaration must be construed in accordance with the Department of Health and Human Services (HHS) Office of the General Counsel (OGC) Advisory Opinions [of April 17, 2020 as modified on May 19, 2020 and October 22, 0220 as modified on October 23, 2020] on the Public Readiness and Emergency Preparedness Act and the Declaration ("Advisory Opinions").  The Declaration incorporates the Advisory Opinions for that Purpose***."   [Emphasis added.] Thus, the Fourth Amended Declaration incorporates all HHS Office of the General Counsel Advisory Opinions related to COVID-19 and the PREP Act into the Secretary's March 10, 2020 initiating Declaration.  Beyond question, these Advisory Opinions must be given *Chevron* controlling weight.   Where Congress has expressly delegate interpretive authority to an agency, that agency's interpretative proclamations are controlling on the federal courts. See *Chevron USA, Inc. v. Natural Resources Defense Council, Inc.*, 467 US 837, 843–844 (1984).  Moreover,  section (b)(7) of the PREP Act provides that "[n]o court of the United States, or of any state, shall have subject jurisdiction to review whether by mandamus or otherwise, any action by the Secretary under this subsection."

22.  Crucially, as discussed more completely below, Amendment Four directly acknowledges the federal interests in cases which require interpretation and application of the PREP Act:

> "COVID-19 is a global challenge that requires a whole-of-nation response. **There are substantial federal legal and policy issues, and substantial federal legal and policy interests within the meaning of *Grable & Sons Metal Products, Inc. v. Darue Eng'g. & Mf'g.*, 545 U.S. 308 (2005), in having a unified, whole-of-nation response to the COVID-19 pandemic among federal, state, local, and private-sector entities.**" [Emphasis added.[

See Defendant's RFJN Exhibit E, pages. 26, and pages 13–14.

23.  Amendment Four further explains:

> The world is facing an unprecedented pandemic. To effectively respond, there must be a **more consistent** pathway for Covered Persons to manufacture, distribute, **administer** or use Covered Countermeasures across the nation and the world. Thus, there are substantial federal legal and policy issues, and substantial federal legal and policy interests within the meaning of *Grable & Sons Metal Products, Inc. v. Darue Eng'g. & Mf'g.*, 545 U.S. 308 (2005), in having **a uniform interpretation of the PREP Act**.  [Emphasis added.]

See Defendant's RFJN Exhibit E, page 26.   Thus, Amendment Four declares that the interpretation of the PREP Act is a matter of significant and substantial federal concern, and that removal of any case involving the interpretation of that Act is proper in accordance with the Supreme Court holding in *Grable*.

24.     Here, Plaintiff's claims are preempted by the PREP Act.   Under the PREP Act, Congress has provided an exclusive remedy and exclusive federal jurisdiction for the substance of the allegations and relief sought in the Complaint thereby preempting State law with respect to the claims raised in the Complaint. Moreover, Defendant's administration of countermeasures, such as the use of facemasks and other PPE, and COVID-19 testing, to diagnose, treat, prevent or mitigate the spread of COVID-19 which forms the basis of this action, presents a federal question under the PREP Act giving this Court original jurisdiction preempting the state claims asserted by Plaintiff in the Complaint.

### B.     The PREP Act Applies Because Defendant is a Covered Person

25.     Immunity under the PREP Act is afforded to "covered persons" which include a person or entity that is a "program planner" of a covered countermeasure, and/or a qualified person who prescribed, administered, or dispensed such countermeasure. Under the Act, "person" includes "an individual, partnership, corporation, association, entity, or public or private corporation." 42 U.S.C. §247d-6d (i)(2) and (5).   The term "program planner" includes persons/entities "who supervised or administered a program with respect to the administration, dispensing, . . . provision, or use of a . . . qualified pandemic product or epidemic product, including a person who has established requirements, provided policy guidance, or supplied technical or scientific advice or assistance or provides a facility to administer or use a covered countermeasure in accordance with a [HHS Secretary's] declaration . . . ."   42 U.S.C. §247d-6d (i)(6).

26.     A private sector employer or other person can be a "program planner" when it carries out prescribed activities.  (See Defendants' RFJN- Exhibit "B" -March 10, 2020 Declaration Under the Public Readiness and Emergency Preparedness Act for Medical Countermeasures Against COVID-19, Federal Register, Vol. 85, No. 52, pg. 15199.)  Robert Charrow, General Counsel for the Office of the Secretary of the Department of Health and Human Services, also recently issued a letter which provides that a "senior living community" meets the definition of a "program planner" to the extent that it

-8-

supervises or administers a program with respect to the administration, dispensing, distribution, provision or use of a qualified pandemic or epidemic product, including the provision to a facility to administer or use a covered countermeasure. (See Defendant's RFJN Exhibit "F" to Defendants' RFJN.)

The broad definition of "program planner" was also addressed in Advisory Opinion 20-04, issued October 22, 2020, by General Counsel Charrow. (See Exhibit "G" to Defendants' RFJN)

27.     Defendant qualifies as a "covered person" under the PREP Act.  At the time of the allegation set forth in the Complaint, Redwood Springs was acting as a "program planner" and "qualified person."   Redwood Springs is a skilled nursing facility licensed by the California Department of Public Health, which employs licensed nursing personnel, including Registered Nurses and Licensed Vocational Nurses, who are authorized to prescribe, administer, or dispense the covered countermeasures set forth in Plaintiffs' Complaint (i.e., PPE including facemasks, gloves, gowns, face shields, N95 masks, and COVID-19 testing) under the laws of the State of California.  Additionally, Redwood Springs is a program planner that was supervising and administering a program with respect to the administration, dispensing, provision and use of qualified pandemic and epidemic products.

### C.     The PREP Act Applies Because the Allegations of the Complaint Concern Defendants' Administration and Use of "Covered Countermeasure"

28.     The PREP Act is applicable with respect to a "covered countermeasure," which definition includes: "(1) a qualified pandemic or epidemic product (as defined in § 247d-6d (i) (7)) . . . or (4) a respiratory protective device that is approved by the National Institute for Occupational Safety and Health ("NIOSH") and that the Health and Human Service Secretary determines to be a priority for use during a public health emergency declared under section 247d." 42 USC § 247d-6d (i) (1). A "qualified pandemic or epidemic product" is defined as: a drug, biologic product or device that is:

> "(A)(i) a product manufactured, used, designed, developed, modified, licensed, or procured—
> > (I) to diagnose, mitigate, prevent, treat, or cure a pandemic or epidemic; or
> > (II) to limit the harm such pandemic or epidemic might otherwise cause;
> (ii) a product, manufacture, used, designed, developed, modified, licensed, or procured to diagnose, mitigate, prevent, treat, or cure a serious of life-threatening disease or condition caused by a product described in clause (i); or

**DEFENDANTS, SPRUCE HOLDINGS, LLC dba REDWOOD SPRINGS HEALTHCARE CENTER'S NOTICE OF REMOVAL OF ACTION**

(iii) a product or technology intended to enhance the use or effect of a drug, biologic product, or device described in clause (i) or (ii); and

(B)(i) approved or cleared under chapter V of the Federal Food, Drug, and Cosmetic Act or licensed under section 262 of this title;

(ii) the object of research for possible use as described in subparagraph (A) and is the subject of an exemption under section 505(i) or 520(g) of the Federal Food, Drug, and Cosmetic Act; or

(iii) authorized for emergency use in accordance with section 564, 564A, or 564B of the Federal Food, Drug and Cosmetic Act."

See 42 USC § 247d-6d (i)(7).

29.     Robert P. Charrow, General Counsel for the Department of Health and Human Services Office of the Secretary, issued an omnibus advisory opinion to address questions and concerns regarding the scope of the PREP Act immunity for the COVID-19 pandemic. The Opinion summarized the requirements to meet the definition of a qualified pandemic or epidemic product noting that the product:

(1) must be used for COVID-19; and

(2) must be

(a) approved, licensed, or cleared by FDA

(b) authorized under an EUA [emergency use authorization];

(c) described in an EUI [emergency use instructions]; or

(d) used under either an Investigational new Drug (IND) application or an Investigational Device Exemption."

(See Advisory Opinion attached as Exhibit "H" to Defendants' RFJN, pg. 4.)

30.     Moreover, attached as Appendix A to this Advisory Opinion is a list of the "covered countermeasures" for which emergency use authorizations have been issued by the United States Food and Drug Administration. (See Exhibit "I" to Defendants' RFJN.) The list includes twelve pages of COVID-19 test kits, and provides that face shields, gowns, shoe covers, non-surgical isolation gowns, surgical caps, properly labeled non-surgical masks, and certain non-NIOSH approved respirators are covered by an EUA. Surgical masks are not listed; however, such masks are Class II medical devices which are cleared by the FDA for use.   (See 21 CFR 878.4040).  Thus, COVID-19 testing kits, face masks, gowns, gloves and other PPE are "qualified pandemic or epidemic products" and "covered countermeasures" under the PREP Act, as such products are either FDA cleared/approved or are included in an EUA.

///

///

**DEFENDANTS, SPRUCE HOLDINGS, LLC dba REDWOOD SPRINGS HEALTHCARE CENTER'S NOTICE OF REMOVAL OF ACTION**

**D.**    ***The PREP Act Applies as there is a Causal Nexus Between the Admiration or Use of a Covered Countermeasure by a Covered Person to the Alleged Injuries.***

31.    Immunity under the PREP Act "applies to **any claim for loss that has a causal relationship with the administration to or use by an individual of a covered countermeasure, including a causal relationship with the** . . . distribution . . . **purchase, donation, dispensing, prescribing, administration, licensing, or use of such countermeasure**." [Emphasis added.] 42 USC § 247d-6d (a)(2)(B).

32.    Plaintiff alleges that Defendant failed to prevent decedent, Joseph Gagliolo from contracting COVID-19. Such claim by its nature arises out of Redwood Springs's use, distribution, procurement and administration of covered countermeasures/qualified pandemic products (including COVID-19 testing kits, NIOSH approved respiratory protective devices and other PPE) used to diagnose, mitigate, prevent, treat or cure the COVID-19 virus, or to limit the harm COVID-19 might otherwise cause thereby triggering application of the PREP Act.

33.    In his initial March 10, 2020 Declaration, HHS Secretary Azar notes that the "PREP Act does not explicitly define the term 'administration' but does assign the Secretary the responsibility to provide relevant conditions in the Declaration."  In Section IX of the Declaration, Secretary Azar defines "administration of a covered countermeasure" as the "physical provision of the countermeasures to recipients ***or activities and decisions directly relating to public and private delivery, distribution and dispensing of the countermeasures to recipients***; ***management and operation of countermeasure programs; or management and operation of locations for purpose of distributing and dispensing countermeasures***." [Emphasis added.]  (See Defendant's RFJN Exhibit "B")

34.    Under the PREP Act, the Secretary may specify that liability protections are in effect only for Covered Countermeasures obtained through a particular means of distribution.  Section VII of Secretary Azar's initial March 10, 2020 Declaration provided that "liability immunity is afforded to Covered Persons only for Recommended Activities that are related to (a)  Present or future federal contracts, cooperative agreements, grants, other transactions, interagency agreements, memoranda of understanding, or other federal agreements; or (b) Activities authorized in accordance with public

**DEFENDANTS, SPRUCE HOLDINGS, LLC dba REDWOOD SPRINGS HEALTHCARE CENTER'S NOTICE OF REMOVAL OF ACTION**

1  health and medical response of the Authority Having Jurisdiction to prescribe, administer, deliver,

2  distribute or dispense the Covered Countermeasures following a Declaration of an emergency." (See

3  Defendant's RFJN Exhibit "B")

4        35.    Moreover, Secretary Azar's Fourth Amended Declaration amended Section VII of the

5  Declaration.  This Fourth Amendment provides that "***COVID-19 is an unprecedented global challenge***

6  ***that requires a whole-of-nation response that utilizes federal-, state-, and local-distribution channels***

7  ***as well as private-distribution channels.  Given the broad scale of this pandemic, the Secretary***

8  ***amends [Section VII of] the Declaration to extend PREP Act coverage to additional private-***

9  ***distribution channels*** . . . ." [Emphasis added.] (See Page 12 of Defendants' RFJN- Exhibit "E".)

10        36.    The Fourth Amended Declaration specifically provides that Section VII of the

11  Declaration is amended to extend liability protection under the PREP Act to Covered Persons for

12  Recommended Activities that are related to: "Covered Countermeasures that are:

13        i. Licensed, approved, cleared or authorized by the FDA (or that are permitted to be used
      under an Investigational New Drug Application or an Investigational Device

14        Exemption) under the FD&C Act or PHS Act to treat, diagnose, cure, prevent, mitigate,
      or limit the harm from COVID-19, or the transmission of SARS-CoV-2 or a virus

15        mutating therefrom; or
      ii. A respiratory protective device approved by NIOSH under 42 CFR part 84, or any

16        successor regulations, that the Secretary determines to be priority for use during a public
      health emergency declared under section 319 of the PHS Act to prevent, mitigate, or

17        limit the harm from COVID-19, or the transmission of SARS-CoV-2 or a virus mutating
      therefrom."

18

19        (See Pages 22-23 of Defendants' RFJN- Exhibit "E".)

20        37.    The PREP act was designed to apply to individuals and entities responding to public

21  health emergencies, and provides immunity for claims involving "covered countermeasures" under the

22  Act.  Plaintiff's claims involve activities and decisions directly related to the delivery, distribution and

23  dispensing of countermeasures to recipients and the management and operation of Redwood Springs's

24  covered countermeasures program, including decisions as to how best to optimize supplies of PPE and

25  utilize COVID-19 testing kits in light of known regional and national shortages. The broad definition of

26  "administration of a covered countermeasure" set forth in Secretary Azar's declaration encompasses

27  Defendant's plans and decisions with respect to how best to utilize and optimize supplies of PPE and

28  COVID-19 testing kits, and whether and when the use of such countermeasures is appropriate.

**DEFENDANTS, SPRUCE HOLDINGS, LLC dba REDWOOD SPRINGS HEALTHCARE CENTER'S NOTICE OF REMOVAL OF ACTION**

1 Moreover, during the relevant time frame to Plaintiff's' claims, Redwood Springs was subject to

2 guidance/directives issued by the Centers for Disease Control and Prevention ("CDC"), Centers for

3 Medicaid and Medicare Services ("CMS"), and the California Department of Public Health ("CDPH"),

4 and was following this applicable public health guidance with respect to the use of PPE and COVID-19

5 testing. Redwood Springs has thus established that it has immunity under the PREP Act as it relates to

6 Plaintiff's claims relating to deficiencies in the use of PPE or COVID-19 testing.

## V.   THIS CASE RAISES A SUBSTANTIAL AND IMPORTANT FEDERAL ISSUES THUS PROVIDING EMBEDDED FEDERAL QUESTION JURISDICTION OVER PLAINTIFF'S CLAIMS

10        38.      Federal jurisdiction is further appropriate as this state action "arises under" federal law

11 and raises a substantial federal issue.  See *Grable & Sons Metal Products v. Darue Enginerring &*

12 *Manufacturing*, 545 U.S. 308 (2005).  The applicability of the PREP Act poses a substantial federal

13 issue which would serve to clarify and determine vital issues of federal law. Federal question

14 jurisdiction over state law claims may be sustained if the claims present a substantial, imbedded

15 question of federal law. *Merrell Dow Pharmaceuticals Inc. v. Thompson*, 478 US 804, 808 (1986).  In

16 *Grable & Sons Metal Products v. Darue Engineering & Mfg*, 545 U.S. 308 (2005), the United States

17 Supreme Court held that removal is appropriate if (1) the state law claim necessarily raises a disputed

18 and substantial issue; and (2)  a federal court may entertain the claims without disturbing federal/state

19 comity principles. *Id*. at 314.

20        39.      In his Fourth Amended Declaration, Secretary Azar makes explicit that the PREP Act

21 presents substantial federal legal and policy issues, and that there are substantial federal legal and

22 policy interests within the meaning of *Grable & Sons Metal Products v. Darue Enginerring &*

23 *Manufacturing*, in having a unified whole-of-nation response to the COVID-19 pandemic among

24 federal, state, local and private-sector entities. The Secretary attests that "[t]he world is facing an

25 unprecedented global pandemic.  To effectively respond, there must be a more consistent pathway for

26 Covered Persons to manufacture, distribute, administer or use Covered Countermeasures across the

27 nation and the world. **Thus, there are substantial federal legal and policy issues, and substantial**

28 **federal legal and policy interests within the meaning of *Grable & Sons Metal Products v. Darue***

**DEFENDANTS, SPRUCE HOLDINGS, LLC dba REDWOOD SPRINGS HEALTHCARE CENTER'S NOTICE OF REMOVAL OF ACTION**

**Engineering & Mfg, 545 U.S. 308 (2005), in having a uniform interpretation of the PREP Act.**
Under the PREP Act, the sole exception to the immunity for suit and liability of covered persons is an exclusive Federal cause of action against a Covered Person for death or serious physical injury proximately caused by willful misconduct of such Covered Person. In all other cases, an injured party's exclusive remedy is an administrative remedy under section 319F-4 of the PHS Act.  Through the PREP Act, Congress delegated to me the authority to strike the appropriate Federal-state balance with respect to particular Covered Countermeasures through PREP Act declarations." [Emphasis added.] See pages 13-14, and 25-26 of Defendant's RFJN Exhibit "E")

40.      Thus, by the express terms of the Secretary's Fourth Amended Declaration, removal is proper under *Grable* because Plaintiff's state law claims raise a substantial issue of federal law involving the interpretation and application of the PREP Act.  Secretary Azar's Fourth Amended Declaration directly addresses the federal interest in cases such as this, by stating not once, but twice: "**there are substantial federal legal and policy issues, and substantial federal legal and policy interests within the meaning of *Grable & Sons Metal Products, Inc. v. Darue Eng'g. & Mf'g.*, 545 U.S. 308 (2005)**."  Here, Plaintiff alleges that Defendant failed to prevent decedent, Joseph Gagliolo from contracting COVID-19.  Such claim by its nature arises out of Redwood Spring's administration of covered countermeasures and invokes the PREP Act.  Thus, the federal legal and policy issues described in Secretary Azar's Fourth Amended Declaration control and require this Court to retain this action.

41.      This case involves issues of national importance.  While Plaintiff does allege State causes of action, Plaintiff's claims relate to the Defendant's response to a national public health state of emergency, which has not been seen by this Country in over a century.  The healthcare response to this pandemic was coordinated at a national level by the Department of Health and Human Services, the CDC, the FDA and CMS, and entailed the issuance of detailed directives to healthcare providers to identify and sequester infected patients, which patients under investigation were to be tested, and the use of personal protective equipment. All cases positive for COVID-19 were reported to the CDC, and initially all testing was conducted solely through the CDC. Plaintiff's Complaint raises issues with respect to Redwood Springs's response to a national pandemic and the response to the pandemic

-14-

coordinated at a federal level; as well as the procurement, use, allocation, distribution and administration of PPE and COVID-19 testing, which invoke a substantial federal question regarding the extent to which the broad immunities afforded under the PREP Act apply to the conduct of Redwood Springs.

42.     The application of the PREP Act raises a substantial federal issue which is disputed. The allegations in the Complaint arise out of Defendant's response to the COVID-19 pandemic and are inextricably intertwined with and invoke the PREP Act and the Declarations of the Health and Human Services Secretary.  The Federal Court has a substantial interest in determining the application of the PREP Act in this matter.   The PREP Act and its triggering immunity, has been invoked in exceptionally rare circumstances since it was enacted in 2005.  The PREP Act and HHS Secretary Azar's declarations confer a broad and sweeping immunity to individuals and entities fighting the COVID-19 pandemic during this declared state of emergency.  The unique character of the COVID-19 virus as well as its high communicability, required Secretary Azar to set forth an expansive declaration covering broad categories of measures to fight the pandemic including COVID-19 testing and PPE, all of which require interpretation as to the scope and application.  Thus, there can be no doubt that there is a substantial and compelling interest for the PREP Act and the Secretary's declaration to be interpreted by the Federal Courts. Moreover, the Federal Court is uniquely and properly positioned to interpret Congressional intent and interests of the federal government.

43.     This case also satisfies the second prong set forth in *Grable*.  Federal jurisdiction over Plaintiff's claims will not disturb federal-state comity principles under the Grable.  As set forth by Secretary Azar in his Fourth Amended Declaration:  "Through the PREP Act, Congress delegated to me the authority to strike the appropriate Federal-state balance with respect to  particular Covered Countermeasures through PREP Act declaration."   Moreover, the plain, statutory language of the PREP Act expresses a strong federal interest and a clear intention to supersede or preempt state control of the issues raised by Plaintiffs' Complaint.

44.     Congress did not intend the application of PREP Act immunity to be decided by State Courts.  As such, this Court would not be disturbing or infringing on any balance of State and Federal judicial responsibilities by retaining jurisdiction.  To the contrary, the plain language of the statute

seeks to assert broad federal authority over the issues arising under the Act, and seeks to eliminate all semblance of State Court control.   Secretary Azar's Fourth Amended Declaration makes explicitly clear that there is exclusive federal jurisdiction over lawsuits involving covered countermeasures, and that this "federal jurisdiction" is essential to the uniform provision of a national response to the COVID-19 pandemic and the PREP Act.

## IV.    FEDERAL QUESTION JURISDICTION IS PROPER UNDER THE DOCTRINE OF "COMPLETE PREEMPTION" BECAUSE THE PREP ACT EXPRESSLY PREEMPTS STATE LAW CLAIMS FOR LOSS, AND PROVIDES AND EXCLUSIVE SET OF FEDERAL REMEDIES

45.     On its face, Plaintiff's claims appear to sound in state law. However, Congress has already provided an exclusive remedy for Plaintiff's "claim for loss" under the PREP Act.

46.     The issue of whether federal question jurisdiction exists when a plaintiff asserts a claim in state law was addressed by the Supreme Court in *Beneficial Nat. Bank v. Anderson*, 539 U.S. 1 (2003). The Court explained:

> [A] state claim may be removed to federal court … when a federal statute wholly displaces the state-law cause of action through **complete pre-emption**. When the federal statute completely pre-empts the state-law cause of action, a claim which comes within the scope of that cause of action, even if pleaded in terms of state law, is in reality based on federal law. In the two categories of cases where this Court has found complete pre-emption … the federal statutes at issue **provided the exclusive cause of action** for the claim asserted and also **set forth procedures and remedies governing that cause of action**.

*Id.* at 8 (emphasis supplied; internal citations and footnotes omitted).

47.     There, the plaintiff brought an action for usury under state law, which was preempted by the usury provisions of the National Bank Act (12 U.S.C.A. §§ 85 and 86). The Court held that even though Congress did not explicitly provide for removal of preempted claims, the provisions collectively "supersede[d] both the substantive and the remedial provisions of state usury laws and create a federal remedy for overcharges that is exclusive." *Beneficial Nat. Bank, supra,* at 11. Therefore, the court held that federal question jurisdiction was proper under the "complete preemption" doctrine.

///

///

-16-

48.     Since 2003, the doctrine of "complete preemption" has been applied by the lower courts to at least ten other statutes.[2] Circuit and district courts considering the issue have found "complete preemption" where a federal statute (1) expressly preempts state law and (2) creates an exclusive federal remedy for preempted state claims. *See, e.g., In re WTC Disaster Site*, 414 F.3d 352, 380 (2d Cir. 2005); *Spear Marketing, Inc. v. Bancorp South Bank*, 791 F.3d 586 (5th Cir. 2015); *Nott v. Aetna U.S. Healthcare, Inc.*, 303 F.Supp.2d 565 (E.D.Pa. 2004).

49.     The PREP Act plainly satisfies both prongs of this analysis. First, the PREP Act clearly preempts any state law that runs afoul of the immunity granted thereunder. Under 42 U.S.C.A. § 247d-6d(a)(1), a "covered person" is afforded broad immunity "from **suit and liability** under Federal **and State law**" for "**all claims for loss** caused by, arising out of, relating to, or resulting from" the "administration" or "use" of a "covered countermeasure" if the Secretary of the Department of Health and Human Services issues a declaration to that effect—which it has. (Emphasis supplied). The PREP Act also expresses its clear intention to preempt state control of the issues raised, and explicitly provides as follows:

> "During the effective period of a declaration under subsection (b), or at any time with respect to conduct undertaken in accordance with such declaration, no State or political subdivision of a State may establish, enforce, or continue in effect with respect to a covered countermeasure any provision of law or legal requirement that—
> (A) is different from, or is in conflict with, any requirement applicable under this section; and
> (B) relates to the . . . distribution, sale, donation, purchase . . . or the prescribing, dispensing or administration by qualified persons of the covered countermeasure, or to any matter included in a requirement applicable to the covered countermeasure under this section or any other provision of this chapter. . ."

---

[2] These include the Transportation Safety and System Stabilization Act (*In re WTC Disaster Site*, 414 F.3d 352 (2d Cir. 2005)); the Bankruptcy Code (*In re Miles*, 430 F.3d 1083 (9th Cir. 2005)); the Carmack Amendment to the Interstate Commerce Act (*see, e.g., Smallwood v. Allied Van Lines, Inc.*, 660 F.3d 1115 (9th Cir. 2011); the Interstate Commerce Commission Termination Act (*see, e.g., Elam v. Kansas City Southern Ry. Co.*, 635 F.3d 796 (5th Cir. 2011)); the Copyright Act (*see, e.g., Spear Marketing, Inc. v. BancorpSouth Bank*, 791 F.3d 586 (5th Cir. 2015); the Federal Communications Act (*see, e.g., Bastien v. AT&T Wireless Services, Inc.*, 205 F.3d 983 (7th Cir. 2000); the Federal Deposit Insurance Act (*Vaden v. Discover Bank*, 556 U.S. 49, 129 S. Ct. 1262, 173 L. Ed. 2d 206 (2009); the Federal Railroad Safety Act (*see, e.g., Lundeen v. Canadian Pacific R. Co.*, 532 F.3d 682 (8th Cir. 2008)); the National Labor Relations Act (*see, e.g., Price v. Union Local 25*, 787 F. Supp. 2d 63 (D.D.C. 2011); and the Securities Litigation Uniform Standards Act (SLUSA) (*see, e.g., Brockway v. Evergreen Intern. Trust*, 496 Fed. Appx. 357 (4th Cir. 2012).

-17-

50.     Second, the PREP Act clearly establishes a set of exclusive federal remedies for any claim preempted, and also establishes the procedures applicable to such actions. Under 42 USC § 247d-6d(d)(1) "the sole exception to the immunity from suit and liability of covered persons … shall be for an exclusive Federal cause of action against a covered person for death or serious physical injury proximately caused by willful misconduct." Claims for "willful misconduct" are subject to several heightened pleading requirements. *Id*. § 247d-6d(e)(1)-(4). The statute further sets forth the procedures for suit, which must be filed in the US District Court for the District of Columbia. 42 USC §247d-6d(e)(1), including requirements for pleading with particularity, verification of and submission of physician declaration in support of the Complaint, and assignment of the action to a three-judge panel which shall have jurisdiction to consider motions to dismiss, and motions for summary judgment.   § 247d-6d(e)(1), (e)(5). Moreover, §247d-6d(e)(10), the "*United States Court of Appeals for the District of Columbia Circuit shall have jurisdiction of an interlocutory appeal by a covered person taken within 30 days of an order denying a motion to dismiss or motion for summary judgment based on an assertion for the immunity from suit conferred by subsection (a) or based on an assertion of the exclusion under subsection (c)(5)*." [Emphasis added.]  Hence, the PREP Act sets up an exclusive cause of action for the claims asserted by Plaintiff and the procedures and remedies governing the cause of action.

51.     An alternative remedy is also available for any claims barred by 42 U.S.C.A. § 247d-6d. Under § 247d-6e, an individual is permitted to claim no-fault benefits through the Covered Countermeasure Process Fund for a "covered injury directly caused by the administration or use of a covered countermeasure." In fact, even a claimant alleging "willful misconduct" must first apply for benefits through the Fund under § 247d-6e before bringing an action in the District of Columbia under § 247d-6d(d). § 247d-6e(d)(1).

52.     Therefore, it is clear that Congress sought to establish a set of exclusive federal remedies for claims that are preempted under the PREP Act.

53.     Here, both prongs of the "complete preemption" analysis are satisfied by the PREP Act: (1) Congress clearly intended to preempt state law with respect to claims that invoke PREP Act immunity; and (2) Congress clearly intended to create an exclusive federal remedy for such preempted

claims. Thus, the PREP Act meets the requirements for removal jurisdiction as set forth by the United States Supreme Court in *Beneficial National Bank v. Anderson*, 539 US 1 (2003), and any claim falling within its broad preemptive ambit is subject to removal under the doctrine of "complete preemption."

## V.  REMOVAL IS PROPER BECAUSE THIS COURT HAS JURISDICTION UNDER THE FEDERAL OFFICER STATUTE

54.  Removal is proper under 28 U.S.C. §1442(a)(1), which provides for removal when a Defendant is sued for acts undertaken at the direction of a federal officer. Removal is appropriate under §1442(a)(1), when the removing defendant establishes that:

(a)  Defendant is a "person";

(b)  Defendant was acting under the direction of a federal officer when it engaged in the allegedly tortious conduct;

(c)  There is causal nexus between the Plaintiffs' claims and the Defendant's actions under federal direction; and

(d)  Defendant has raised a colorable defense based upon federal law.

*Goncalves v. Rady Children's Hospital San Diego* 865 F.3d 1237, 1244 (9th Cir. 2017). Courts have a duty to broadly interpret § 1442 in favor of removal, which "should not be frustrated by a narrow, grudging interpretation" of the statute. *Id*. at pg. 1244 [quotations and citations omitted.]

55.  This statute creates removal jurisdiction even as to cases that otherwise could not be commenced in or removed to federal court (e.g., common law negligence action against government driver who lives in same state as plaintiff; hence no diversity). *Jefferson County, Ala. v. Acker* (1999) 527 US 423, 431; *Mir v. Fosburg* (9th Cir. 1980) 646 F.2d 342, 344 Moreover, unlike the usual rule that removability in federal question cases must appear on the face of a well-pleaded complaint, cases may be removable under §1442(a) when a federal officer or agency raises a "colorable federal defense" See *Jefferson County, Ala. v. Acker*, *supra*, 527 US at 431.

56.  Here, Defendant, Redwood Springs, satisfies all elements for removal under §1442(a)(1). Defendant is a "person" for the purpose of the federal officer. The term "person" includes "corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals." 1 U.S.C. § 1; See also *Goncalves*, 865 F.3d at 1244.

-19-

57.     Defendant, Redwood Springs, was also acting under the direction of a federal office when it engaged in the alleged tortious conduct. The United States Supreme Court has held that the phrase "acting under" involves "an effort to *assist*, or help *carry out*, the duties or tasks of the federal superior." *Watson v. Philip Morris Cos*., 551 US 142, 152 (2007); see also *In re Commonwealth's Motion to Appoint Counsel Against or Directed to Defender Association of Philadelphia*, 790 F.3d 457 (3rd. Cir. 2015) The "acting under" requirement is broad and is to be liberally construed. *Watson*, 551 US at pg. 147.

58.     "[R]emoval by a 'person acting under' a federal officer must be predicated upon a showing that the acts that form the basis for the state civil or criminal suit were performed pursuant to an officer's direct orders or to comprehensive and detailed regulations. *Cf. Bakalis v. Crossland Savings Bank,* 781 F.Supp. 140, 144-145 (E.D.N.Y. 1991) ('The rule that appears to emerge from the case law is one of 'regulation plus ...'.")." *Ryan v. Dow Chemical Co.*, 781 F. Supp. 934, 947 (E.D.N.Y. 1992) "This control requirement can be satisfied by strong government intervention and the threat that a defendant will be sued in state court 'based upon actions taken pursuant to federal direction.'"  See *Fung v. Abex, Corp*., 816 F. Supp. 569, 572 (N.D. Cal. 1992). The "acting under" requirement is met when Defendant is acting pursuant to detailed and ongoing instructions from a federal officer. *Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d. 387 (5th Cir. 1998).

59.     Defendant, Redwood Springs, meet the "acting under" prong for removal based on the federal officer statute. Here, Plaintiff contends that the acts and omissions of Defendant, Redwood Springs, with respect to its response to the COVID-19 pandemic caused decedent, Joseph Gagliolo, to contract the virus and led to his death therefrom.  Specifically, in paragraph 30 on page 7 and paragraph 62 on page 15 of the Complaint, Plaintiff alleges that Redwood Springs failed to prevent decedent from contracting COVID-19. (See RFJN Exhibit A- Plaintiff's Complaint, pgs. 5-6, ¶s 15-18, pg. 6, ¶ 22, pgs. 7-9, ¶s 28-35 pg. 14, ¶ 60- pg. 15, ¶ 62, and pg. 15, ¶ 66.)

60.     Prior to the current national pandemic, regulation of nursing homes was very general in nature.  In 1987, Congress enacted legislation, known as the Nursing Home Reform Act, requiring nursing homes participating in Medicare and Medicaid to comply with certain quality of care rules and regulations. See 42 U.S.C. § 1396r, 42 U.S.C. §1395i-3 and 42 C.F.R. § 483.1 through 42 C.F.R.

-20-

§483.95.  The Centers for Medicare and Medicaid Services, contracts with state surveyors, including the California Department of Public Health in California ("CDPH"), to perform federal surveys to ensure that facilities accepting Medicare and Medicaid (Medi-Cal) payments comply with federal laws and regulatory requirements.  Generally, and prior to the pandemic, these surveyors conducted site visits to evaluate whether facilities are in compliance with federal requirements and regulations. See 42 U.S.C. § 1395aa; and 42 CFR § 488.10.   If CDPH surveyors found a "deficiency" in a facility's compliance with federal regulations, CDPH would issue a deficiency or citation, and on occasion use the CMS enforcement remedy of a "directed plan of correction," under which the facility would develop and submit a plan of correction, which would then be enforced on behalf of CMS by CDPH.

61.     In January, 2020, in response to the pandemic and the national state of emergency, CMS and the CDC, began issuing detailed directives to healthcare facilities as part of the coordinated national effort to respond to and contain the COVID-19 pandemic.  CDPH surveyors, contracted by CMS, were supervising skilled nursing facilities with respect to all aspects of infection control and the pandemic response and ensuring strict compliance with the CMS directives.   The issuance of in time and evolving guidance in response to a public health emergency was in contrast to the role of CMS before the pandemic.  Prior to the pandemic, the focus was on ensuring compliance with existing regulations.  However, throughout the pandemic, CMS and CDPH as its agent, specifically instructed facilities to take or not take particular clinical and operational actions in the absence of finding deficiencies that would otherwise require the facility to develop its own plan of correction.  These directives included the following:

A.     Early directives to skilled nursing facilities focused on monitoring residents and staff for symptoms and protecting healthcare providers from infection due to contact with symptomatic patients.  Facilities were advised to adhere to standards for infection prevention and take steps to prepare for COVID-19.

B.     In January and February, 2020, the CDC issued a number of health updates regarding the 2019 Coronavirus, as well as criteria to guide the evaluation and testing of patients under investigation ("PUI") for COVID-19.   Healthcare providers were advised to identify PUI based on clinical features (i.e., fever or signs/symptoms of lower respiratory illness), travel to an affected

-21-

geographic region and contact with a laboratory confirmed COVID-19 patient.  Persons meeting the PUI criteria were to be tested and healthcare providers were advised to immediately notify their local or state health department in the event they were evaluating a PUI. State health departments in turn were instructed to immediately contact the CDC and complete a PUI case investigation form.  Initially COVID-19 testing was conducted solely through the CDC, which assisted local/state health departments in the collection, storage and shipment of specimens to the CDC.  During this time, the CDC also directed healthcare providers to use standard, contact and airborne precautions when interacting with PUI.  (See January 8, 2020, CDC Health Update Outbreak of Pneumonia of Unknown Etiology (PUE) in Wuhan China, a true and correct copy of which is attached to Defendants' RFJN as Exhibit "J"; January 17, 2020 CDC Interim Infection Prevention and Control Recommendations for Patients with Known or Patients Under Investigation for 2019 Novel Coronavirus (2019-n-coV) in a Healthcare Setting, a true and correct copy of which is attached to Defendants' RFJN as Exhibit "K"; January 24, 2020 CDC Interim Infection Prevention and Control Recommendations for Patients with Known or Patients Under Investigation for 2019 Novel Coronavirus (2019-n-coV) in a Healthcare Setting, a true and correct copy of which is attached to Defendants' RFJN as Exhibit "L".)

        C.      On February 1, 2020, the CDC issued an "Update and Interim Guidance on the Outbreak of 2019 Novel Coronavirus" to provide further guidance to healthcare providers regarding 2019-nCoV 2019 (the 2019 Novel Coronavirus, now known as COVID-19). ***The guidance was part of the "ongoing US public health response . . . to identify and contain [the] outbreak and prevent sustained spread of 2019-nCoV in the United States"*** and addressed infection prevention and control specific to 2019-nCoV. [Emphasis added.] In the update, the CDC noted that the first United States case was identified on January 21, 2020, and had recently traveled from Wuhan, China.  Since that time, six additional cases had been confirmed in the United States, four among persons who had traveled from Wuhan and one a close contact of a confirmed case. This document further provided updated directives related to screening of patients in healthcare facilities, and coordination with local health departments for testing and reporting of results.  In the update, the CDC set forth the criteria for assessing patients for COVID-19, and advised that patients who meet the criteria should be asked to wear a surgical mask as soon as they are identified and evaluated in a private room with the door

closed, ideally an airborne infection isolation room if available.  Healthcare personnel entering the room were again directed to use standard precautions, contact precautions, airborne precautions and eye protection.  Persons with a confirmed or suspected COVID-19 infection who were hospitalized were to be evaluated and cared for in a private room with the door closed, ideally an airborne infection isolation room.  (See February 1, 2020 CDC Health Update and Interim Guidance on the Outbreak of 2019 Novel Coronavirus (2019-n-coV), a true and correct copy of which is attached to Defendants' RFJN as Exhibit M".)

D.      In January and February, the California Department of Public Health ("CDPH") issued a number of All Facilities Letters (AFLs) pushing out the information and directives issued by the CDC with respect to identification of PUI and infection prevention and control. (See AFL20-09, 20-10, 20-11, 20-13, and 20-15, true and correct copies of which are attached collectively to Defendants' RFJN as Exhibit "N".)

E.      On February 6, 2020, CMS took direct action to prepare healthcare facilities for the national response to the emerging 2019 Novel Coronavirus by issuing a Memorandum to State Survey Agency Directors (i.e., CDPH").  The memo directed healthcare providers to adhere to CDC directives regarding the use of standard, contact and airborne precautions when interacting with PUI and advised facilities to have PPE measures and protocols in place.   (See February 6, 2020 CMS Memorandum QSO 20-09-ALL, a true and correct copy of which is attached to Defendants' RFJN as Exhibit "O")

F.      On February 28, 2020, the CDC issued a Health Update and Interim Guidance on the Outbreak of 2019 Novel Coronavirus (COVID-19) for healthcare providers.   The Update noted that to date there had been limited spread in the United States.  As of February 26, 2020, there were a total of 61 cases in the country, 46 of whom were repatriated person from high-risk settings.   One patient, with no travel history or links to other known cases was reported on February 26,2020 in California.  The guidance again included criteria to guide the evaluation and testing of patients under investigation ("PUI") for COVID-19.  Healthcare providers were advised to identify PUI based on clinical features (i.e., fever or signs/symptoms of lower respiratory illness), travel to an affected geographic region and contact with a laboratory confirmed COVID-19 patient. Persons meeting the

PUI criteria were to be tested. This update further added patients with fever and signs/symptoms of lower respiratory illness without an alternative explanatory diagnosis and no identified source of exposure to the list of those who should be tested. At this time, testing was being performed at state public health laboratories and the CDC.   (See February 28, 2020 CDC Health Update and Interim Guidance on Outbreak of Coronavirus Disease 2019 (COVID-19), a true and correct copy of which is attached to Defendants' RFJN as Exhibit "P".)

G.      On or about March 3, 2020, the CDC issued "Strategies to Prevent the Spread of COVID-19 in Long-Term Care Facilities (LTCF)" This publication, issued specifically to long term care facilities such as Redwood Springs, reiterated that standard, contact and droplet precautions with eye protection were to be used in the care of residents with an undiagnosed respiratory infection. Facilities were advised to make PPE, including facemasks, eye protection, gowns and gloves available immediately outside the resident's room and to post signs on the door or wall outside the room of the residence to clearly describe the type of precautions needed and the required PPE.   (See CDC "Strategies to Prevent the Spread of COVID-19 in Long-Term Care Facilities (LTCF), a true and correct copy of which is attached to Defendants' RFJN as Exhibit "Q").

H.      On March 3, 2020, CDPH pushed the information contained in the CDC February 28, 2020 Interim Guidance and the CDC's March 3, 2020 guidance to long term care facilities in AFL 20-17.   (See CDPH AFL 20-17, a true and correct copy of which is attached to Defendants' RFJN as Exhibit "R").

I.      On March 4, 2020, CMS issued a Memorandum to State Survey Agency Directors regarding Infection Control and Prevention of Coronavirus Disease 2019 (COVID-19) in nursing homes.  The State Survey Agency, as agent for CMS, was also responsible for disseminating the contents of the QSO memo to the States' nursing homes.  The Memo instructed facilities to screen visitors for international travel, symptoms of respiratory infection, and contact with someone with or under investigation for COVID-19, and to restrict entry of visitors who meet these criteria.  Facilities were advised to screen staff for the criteria as well, and that staff who meet the criteria should not report to work. The CMS guidance also included directions as to when to transfer a resident with a suspected or confirmed COVID-19 infection to a hospital, and under what conditions a nursing home

-24-

1    may accept patients diagnosed with COVID-19.  CMS advised facilities to follow the available CDC

2    guidance regarding infection prevention and control. (See CMS Memo QSO 20-14-NH, a true and

3    correct copy of which is attached to Defendants' RFJN as Exhibit "S")

4            J.      On March 8, 2020, the CDC issued further Updated Guidance on Evaluating and

5    Testing Persons for Coronavirus Disease 2019 (COVID-19). The CDC advised that with the expanding

6    spread of COVID-19, additional areas of geographic risk were being identified and the criteria for

7    considering testing were being updated to reflect this spread.  The Update indicated that additional

8    COVID-19 testing was becoming available in clinical laboratories pursuant to FDA Emergency Use

9    Authorizations.  With increased access to testing, the criteria for testing had been expanded to include

10    more symptomatic persons, such as older adults (age 65 and older). Thus, as part of the coordinated

11    national effort to control and mitigate the spread of the pandemic, the CDC had been specifically

12    directing which persons could be tested.   The March 8, 2020 updated guidance, additionally provided

13    detailed instructions for the collecting of specimens.  (See March 8, 2020, the CDC issued further

14    Updated Guidance on Evaluating and Testing Persons for Coronavirus Disease 2019 (COVID-19), a

15    true and correct copy of which is attached to Defendants' RFJN as Exhibit "T")

16            K.      On March 10, 2020, the CDC issued Interim Infection Prevention and Control

17    Recommendations for Patients with Suspected or Confirmed Coronavirus Disease 2019 (COVID-19) in

18    Healthcare Settings. The publication again reiterated the directive regarding use of standard and

19    transmission-based precautions, and directed healthcare providers who enter the room of a patient with

20    known or suspected COVID-19 to adhere to standard precautions and use a respirator or facemask,

21    gown, gloves and eye protection.   The CDC advised that patients with known or suspected COVID-19

22    should be cared for in a single-person room with the door closed. Airborne infection isolation rooms

23    were to be reserved for patients undergoing aerosol generating procedures. The March 10, 2020 CDC

24    publication further noted that "[m]ajor distributors in the United States have reported shortages of PPE,

25    specifically N95 respirators, facemask and gowns."  Based on a local and regional situational analysis

26    of PPE supplies, the CDC advised that facemasks were an acceptable alternative when the supply chain

27    of respirators cannot meet the demand.  During this time, respirators should be prioritized for situations

28    where respiratory protection is most important. Healthcare providers were advised that available

respirators should be prioritized for procedures that are likely to generate respiratory aerosols, which pose the highest exposure risk to healthcare providers.   In the publication, the CDC further advised that in the event of a shortage of medical gowns, gowns should also be prioritized for aerosol generating procedures.  (See March 10, 2020, the CDC issued Interim Infection Prevention and Control Recommendations for Patients with Suspected or Confirmed Coronavirus Disease 2019 (COVID-19) in Healthcare Settings a true and correct copy of which is attached to Defendants' RFJN as Exhibit "U")

L.      On March 10, 2020, CMS issued a Memorandum providing an update regarding the PPE recommendations issued by the CDC on March 10.   (See CMS Memo QSO 20-17-ALL a true and correct copy of which is attached to Defendants' RFJN as Exhibit "V").

M.      On March 11, 2020, CDPH issued an All Facilities Letter notifying long-term care facilities of the latest CDC and CMS directives for infection control and prevention and the March 4, 2020 visitation restrictions issued by CMS.  (See CDPH AFL 20-22, a true and correct copy of which is attached to Defendants' RFJN as Exhibit "W").  Redwood Springs followed these directives and the directives issued prior to this, in an effort to assist and help carry out the CDC and CMS' goal of containing and responding to the pandemic.

N.      On March 13, 2020, President Trump declared the COVID-19 outbreak a national emergency. Following this proclamation, the CDC and CMS took swift action to waive restrictions and expand capacity for healthcare providers and suppliers to coordinate the national response to the nationally declared state of emergency. On March 13, 2020, CMS issued revised infection control and prevention directives for nursing homes to prevent the transmission of COVID-19.   In the Memo, facilities were ordered to restrict visitation of all visitors and non-essential health care personnel, cancel communal dining and all group activities, implement active screening of residents and staff for fever and respiratory symptoms, and screen all staff at the beginning of their shift for fever and respiratory symptoms.  Additional direction was provided regarding patient transfers and acceptance of patients with COVID-19.   Facilities were ordered to continue to follow applicable CDC guidelines.    (See CMS Memo QSO 20-14-NH a true and correct copy of which is attached to Defendants' RFJN as Exhibit "X").

O.     On March 17, 2020, the CDC issued documents containing instructions to optimize the supply of eye protection, isolation gowns, N95 respirators and face masks.   The documents provided a series of specific directives relating to the use PPE based on whether the facility was in conventional capacity (normal operation), contingency capacity (experiencing temporary expected PPE shortages), or crisis capacity (involving periods of known PPE shortages necessitating strategies that are no commensurate with standard U.S. standards of care).   For facilities in contingency capacity, the CDC advised that extended use of facemasks should be implemented and that the use of facemasks should be restricted for use by healthcare providers rather than patients for source control. During crisis capacity, facilities were to prioritize facemask use for use during activities where prolonged face-to face or close contact with a potentially infectious patient is unavoidable, exclude healthcare providers at higher risk for severe illness from COVID-19 from contact with known or suspected COVID-19 patients, use a face shield with no mask, and in settings where facemasks were not available, use homemade masks. In the document pertaining to optimizing the use of N95 respirators, the CDC advised that (1) if the healthcare provider was to remain 6 feet away from a symptomatic patient, no facemask or N95 respirator was required; (2)  if the healthcare provider was to be within 3 to 6 feet of a symptomatic patient, a facemask should be used; and (3) if the healthcare provider was to be within 3 feet of a symptomatic patient including providing direct patient care, an N95 respiratory should be used if available.   When an N95 respirator was not available, healthcare providers were instructed to wear a surgical mask and exclude healthcare providers at higher risk from severe illness from contact with an infectious patient.  (True and correct copies of these documents are attached collectively to Defendants' RFJN as Exhibit "Y")

P.     On March 20, 2020, CMS issued a memo entitled Prioritization of Survey Activities.  In the memo, CMS advised that CMS surveyors would be conducting targeted infection control surveys of providers identified in collaboration with the CDC and the HHS Assistant Secretary for Preparedness and Response to ensure providers are implementing actions to protect the health and safety of individuals to respond to the COVID-19 pandemic. A skilled facility would be subject to citation, and fines for failure to implement the directives from CMS.  **Thus, the directives from CMS (which followed and instructed facilities to follow the CDC guidance) were truly mandates**, not

1  recommendations.  (See CMS Memo QSO 20-20-ALL, a true and correct copy of which is attached to

2  Defendants' RFJN as Exhibit "Z")

3           Q.     On March 21, 2020, the CDC issued further guidance specifically aimed at long

4  term care facilities entitled "Preparing for COVID-19: Long-term Care Facilities Nursing Homes."  In

5  this publication, nursing homes were advised to restrict visitation, restrict all volunteers and non-

6  essential healthcare personnel, cancel group activities and communal dining, implement active

7  screening of residents and healthcare providers for fever and respiratory symptoms, and make PPE

8  available in areas where resident care is provided and place a trash can near the exit inside the

9  resident's room so staff can discard PPE prior to exiting.  The CDC further directed that "residents with

10 known or suspected COVID-19 do not need to be placed in an airborne infection isolation room (AIIR)

11 but should ideally be placed in a private room with their own bathroom.  Room sharing might be

12 necessary if there are multiple residents with known or suspected COVID-19.  As roommates of

13 symptomatic residents might already be exposed, it is generally not recommended to separate them in

14 this scenario."   (See March 21, 2020, CDC publication entitled "Preparing for COVID-19: Long-term

15 Care Facilities Nursing Homes," a true and correct copy of which is attached to Defendants' RFJN as

16 Exhibit "AA")

17          R.     On April 2, 2020, CMS issued new guidelines aimed at long-term care facilities

18 to "mitigate the spread" of COVID-19.  In doing so, CMS noted that "[l]ong-term care facilities are a

19 critical component of America's healthcare system." And that "[i]n recent weeks, CMS and CDC, at

20 President Trump's direction have worked together to swiftly issue unprecedented targeted direction to

21 the long-term care facility industry, including a general prohibition of visitors implemented on March

22 13, 2020, as well as strict infection control and other screening recommendations."  CMS further noted

23 that the CDC and CMS were providing "critical, needed leadership for the Nation's long-term care

24 facilities to prevent further spread of COVID-19" and that long term care facilities were to immediately

25 implement symptom screening for all persons (residents, staff, visitors, outside healthcare workers,

26 vendors, etc.) entering a long term care facilities.  Facilities were ordered to specifically ask about

27 COVID-19 symptoms and to check the temperature of all visitors, as well as limit access points and

28 ensure that all accessible entrances have a screening station.  Every resident was also to be assessed for

-28-

symptoms and have their temperature checked every day, and patients and residents entering facilities screened for COVID-19 through testing, if available. CMS ordered facilities to ensure all staff are using appropriate PPE when interacting with residents to the extent PPE is available and per CDC guidance on the conservation of PPE.   CMS further directed long term care facility staff to wear a facemask while in the facility for the duration of the state of emergency, to wear full PPE for the care of any resident with known or suspected COVID-19, and if COVID-19 transmission occurs in the facility, healthcare personnel were to wear full PPE in the care of all residents irrespective of COVID-19 diagnosis and symptoms.   Further, to avoid transmission within long-term care facilities, the facilities were advised to use separate staffing teams for COVID-19 positive residents to the best of their ability, and to work with State and local leaders to designate separate facilities or units within a facility to separate COVID-19 negative residents from COVID-19 positive residents and individuals with unknown COVID-19 status.  (A true and correct copy of this April 2, 2020 CMS Directive is attached to Defendants' RFJN as Exhibit "BB")

62.     In summary, through the federal directives issued by the CDC, CMS, and the CDPH surveyors contracted by CMS, federal authorities were making the operational decisions as it related to the clinical pandemic response in skilled nursing facilities. Facilities were ordered to restrict visitation, cancel communal dining, implement active screening and staff for fever and respiratory symptoms, screen staff at the beginning of their shift for fever and respiratory symptoms and actively take their temperature and document the absence of shortness of breath and any new or change in cough and sore throat.   Facilities were instructed on which patients and staff to test for COVID-19, under what circumstances to use and how to conserve PPE, when to permit staff who had COVID-19 to return to work, and how to handle the isolation of residents infected with COVID-19 and those under investigation for COVID-19. These very detailed clinical directives and instructions represented a marked departure from the regulatory structure which existed before the pandemic.   Moreover, as acknowledged by Health and Human Services Secretary Alex Azar in his Fourth Amended Declaration Under the Public Readiness and Emergency Preparedness Act for Medical Countermeasures Against COVID-19: "COVID-19 is an unprecedented global challenge that requires a whole-of-nation response that utilizes federal-, state- and local-distribution channels as well as private-distribution channels [for

1   the provision of covered countermeasures].” (See page 12 of Defendants' RFJN Exhibit "E"-

2   December 3, 2020 Fourth Amended Declaration of Health and Human Services Secretary Azar Under

3   the Public Readiness and Emergency Preparedness Act for Medical Countermeasures Against COVID-

4   19.)

5        63.    At all relevant times Redwood Springs was acting at the specific direction of federal

6   authorities to address the on-going federal effort and national state of emergency to contain the

7   COVID-19 pandemic, and prevent the spread of the virus.   All actions taken by Redwood Springs in

8   preparation for and response to the COVID-19 pandemic, were taken "in an effort to assist, or help

9   carry out, the duties or tasks" as ordered by the CDC and CMS, and CDPH surveyors (per the contract

10  with CMS), and performed pursuant to the direct orders and comprehensive and detailed directives

11  issued by these agencies.   Redwood Springs was acting at the direction of the federal government to

12  prevent, treat and contain COVID-19 at the facility and in its care and treatment of Joseph Gagliolo.

13       64.    Next to establish removal under the federal officer statute, Defendant must show "a

14  causal nexus between the plaintiff's claims and the defendant's actions under federal direction."

15  *Winters v. Diamond Shamrock Chemical Co.*, 149 F.3d 387, 398 (5th Cir. 1998).

16       65.    Here, Plaintiff alleges that due to the wrongful acts and omissions of Defendant,

17  decedent, Joseph Gagliolo became infected with COVID-19 during his residency at Redwood Springs

18  and died due to the virus on April 27, 2020.   (See RFJN Exhibit A- Plaintiff's Complaint, pgs. 5-6, ¶s

19  15-18, pg. 6, ¶ 22, pgs. 7-9, ¶s 28-35 pg. 14, ¶ 60- pg. 15, ¶ 62, and pg. 15, ¶ 66.)   Redwood Springs's

20  response to the COVID-19 pandemic as it relates to the claims of Plaintiff (i.e., the care and treatment

21  of Joseph Gagliolo) was directly related to the orders and directives issued by the federal government.

22  There is a clear causal nexus between the claims against Redwood Springs and the actions taken by

23  Redwood Springs at the direction of the federal government including, but not limited to, the direction

24  of CDC, CMS, as well as by representatives of CDPH, the State Survey Agency acting under contract

25  with CMS, with respect to the response to the pandemic at the facility and the administration of care to

26  Joseph Gagliolo. The nexus element is met as Defendant was following the orders/directives of CMS

27  with regard to infection control, COVID-19 testing and the use of PPE.

28    ///

**DEFENDANTS, SPRUCE HOLDINGS, LLC dba REDWOOD SPRINGS HEALTHCARE CENTER'S NOTICE
OF REMOVAL OF ACTION**

66.     Lastly, Defendant meets the final requirement as they intend to assert colorable federal defenses.   For purposes of removal, the defense must be "colorable" and need not be "clearly sustainable" as the purpose for the removal statue is to secure the validity of the defense may be tried in federal court. *Willingham v. Morgan*, 395 U.S. 402, 407 (1969). The colorable federal defense element is met where a defendant alleges its actions were justified as the defendant was complying with federal directives with respect to the alleged wrongful acts. See *Venezia v. Robinson*, 16 F.3d 209, 212 (7th Cir. 1994); and *Mesa v. California*, 489 U.S. 121, 126-127.   See also *Rural Community Workers Alliance v. Smithfield*, 2020 WL 2145350 (W.D. Mo.) finding that compliance with federal guidelines aimed to protect employees from COVID-19 exposure served as a defense to civil liability. Here, Defendant, Redwood Springs was complying with Federal directives and regulations issued by CMS, the CDC, and CDPH, the CMS contracted state surveyors, in responding to all aspects of the COVID-19 pandemic.

67.     As a colorable defense, Defendant, Redwood Springs, also asserts an immunity defense under the Public Readiness and Emergency Preparedness Act ("PREP Act") as set forth at 42 U.S.C. 247d-6d(a)(1).   This Act provides for immunity of "covered persons" from "suit and liability under Federal and State law with respect to all claims for loss caused by, arising out of, relating to, or resulting from the administration to or the use by an individual of covered countermeasure" provided there has been a declaration issued by the Secretary of Health and Human Services with respect to such countermeasure.   On March 10, 2020, United States Health and Human Services Secretary Alex M. Azar issued a Declaration invoking the PREP Act for the COVID-19 pandemic.   The Declaration was effective as of February 4, 2020. (See Defendants' RFJN Exhibit B).    Redwood Springs is a "covered person" under the act.

68     Under the PREP Act and Secretary Azar's initial Declaration, "covered countermeasures" include any qualified pandemic or epidemic product; and any drug, biologic product or device.   A "qualified pandemic or epidemic product" is defined as a drug, biologic product or device, which is a product manufactured, used, designed, developed, modified, licensed or procured to diagnose, mitigate, prevent, treat or cure a pandemic or epidemic; or to limit the harm such pandemic or epidemic might otherwise cause.    Secretary Azar's Declaration also included as covered

-31-

1  countermeasures "any antiviral drug, any biologic, any diagnostic, any other device or any vaccine

2  used to treat, diagnose, cure, prevent, or mitigate COVID-19, or the transmission of SARS-CoV-2 or a

3  virus mutating therefrom, or any device used in the administration of any such product. . ."

4       69.    In the initial Declaration, Secretary Azar declared that "Administration of Covered

5  Countermeasures means physical provision of the countermeasures to recipients, ***or activities and***

6  ***decisions directly relating to public and private delivery, distribution, and dispensing of the***

7  ***countermeasures to recipients; management and operation of countermeasure programs; or***

8  ***management and operation of locations for purpose of distributing and dispensing***

9  ***countermeasures***." [Emphasis added.]

10       70.    Secretary Azar subsequently issued an Amended Declaration under the PREP Act,

11  which was effective as of March 27, 2020.  (See Defendants' RFJN Exhibit C) The Amendment added

12  respiratory protective devices approved by NIOSH (National Institute for Occupational Safety and

13  Health) as a covered countermeasure under the PREP Act.  In the Amendment, the Secretary stated that

14  "any respiratory protective devices approved by NIOSH . . . is a priority for use during the public

15  health emergency that [the Secretary] declared on January 31, 2020 . . . for the entire United States to

16  aid in response of the nation's health care community to the COVID-19 outbreak."

17       71.    On June 4, 2020, Secretary Azar further amended the March 10, 2020 Declaration to

18  clarify that covered countermeasures under the Declaration include qualified products that limit the

19  harm COVID-19 might otherwise cause. This Amendment was effective as of February 4, 2020. (See

20  Defendants' RFJN Exhibit D)

21       72.    Plaintiff's Complaint alleges that Defendant failed to prevent Decedent, Joseph

22  Gagliolo, from contracting COVID-19.  Such claim by its nature relates to Defendant, Redwood

23  Springs Healthcare Center's administration and/or use of covered countermeasures and qualified

24  pandemic products including facemasks, gloves, gowns, N95 masks, and COVID-19 testing kits, used

25  to diagnose, mitigate, prevent, treat or cure COVID-19 or to limit the harm COVID-19 might otherwise

26  cause, and therefore falls under the PREP Act.  42 U.S.C. §§ 247d-6d and 247d-6e (2006), which

27  provides Defendant with immunity for such claims.  Thus, the claims in Plaintiff's Complaint relate to

28  ///

**DEFENDANTS, SPRUCE HOLDINGS, LLC dba REDWOOD SPRINGS HEALTHCARE CENTER'S NOTICE OF REMOVAL OF ACTION**

"covered countermeasures" under the PREP Act, which qualify for and trigger immunity from liability for the claims in this action.  The applicability of the PREP Act is further addressed below in detail.

73.     Removal to federal court is proper in this case, as Defendant has established that all elements for removal under the federal officer statute have been met.

WHEREFORE, Defendant, Spruce Holdings, LLC dba Redwood Springs Healthcare Center, having established that this case is properly removed to Federal Court, Defendant provides notice pursuant to 28 U.S.C. §1446, that the action pending in the Superior Court of the State of California County of Tulare, Case No. VCU284261, is properly removed to the United States District Court for the Eastern District of California, and respectfully requests that this Court exercise jurisdiction over this case.  Should Plaintiff file a Motion to Remand this action, Defendant requests an opportunity to oppose the Motion and more fully respond in a supplemental memorandum.

Dated:  December 7, 2020                                    WILSON GETTY LLP


                                                By:   /s/ Kim S. Cruz
                                                _____
                                                     William C. Wilson
                                                     Kim S. Cruz
                                                     Ryan G. Canavan

                                                Attorneys for Defendant SPRUCE HOLDINGS, LLC dba
                                                REDWOOD SPRINGS HEALTHCARE CENTER

**DEFENDANTS, SPRUCE HOLDINGS, LLC dba REDWOOD SPRINGS HEALTHCARE CENTER'S NOTICE OF REMOVAL OF ACTION**

*Gary Gagliolo, individually and as SII to the Estate of Joseph Gagliolo v. Kaweah Manor, Inc. dba Kaweah Manor Convalescent Hospital, et al.*
**United States District Court**
**Eastern District of Caliornia**
**Case No.**
**\*\*\***
**PROOF OF SERVICE**

I am employed in San Diego County.  I am over the age of 18 and not a party to this action.  My business address is 12555 High Bluff Drive, Suite 270, San Diego, California 92130.

On **December 7, 2020**, I served the foregoing documents, described in this action as:

- **DEFENDANTS, SPRUCE HOLDINGS, LLC dba REDWOOD SPRINGS HEALTHCARE CENTER'S NOTICE OF REMOVAL OF ACTION UNDER 28 U.S.C. §§ 1331, 1441, 1442(a)(1) and 1446**

As follows:

Dawn M. Smith, Esq.
Eric D. Hitchcock, Esq.
Smith Clinesmith, LLP
325 N. St. Paul St., 29th Floor
Dallas, TX 75201
T: 214.953.1900
F: 214.953.1901
Email: dawn@smithclinesmith.com
Email: Eric@smithclinesmith.com
*Counsel for Plaintiff*

**[X]     By CM/ECF ELECTRONIC DELIVERY:**     In accordance with the registered case participants and in accordance with the procedures set forth at the Court's website www.ecf.cacd.uscourts.gov.

**[X]**     I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.  I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on **December 7, 2020** at San Diego, California.

Tonya Jamois

---

**PROOF OF SERVICE**